[No. F063727. Fifth Dist. May 8, 2014.]

CALIFORNIA CRANE SCHOOL, INC., et al., Plaintiffs and Appellants, v. NATIONAL COMMISSION FOR CERTIFICATION OF CRANE OPERATORS et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part II.A.1. of the Discussion and the Disposition are certified for publication.

14

COUNSEL

Alioto Law Firm, Joseph M. Alioto, Theresa D. Moore, Jamie Miller; Law Offices of Jeffery K. Perkins and Jeffery K. Perkins for Plaintiffs and Appellants California Crane School, Inc., and John Nypl.

Law Office of James M. Dombroski, James M. Dombroski; Law Offices of Jeffery K. Perkins and Jeffery K. Perkins for Plaintiffs and Appellants Timothy Maxwell, Jared Maxwell, Vladimir Nypl and Joshua Larsen.

Parsons Behle & Latimer, John N. Zarian and Brook B. Bond for Defendants and Respondents.

OPINION

KANE, Acting P. J.—

## INTRODUCTION

California requires all crane operators to be certified. (Cal. Code Regs., tit. 8, § 5006.1.) Respondent National Commission for Certification of Crane Operators (NCCCO) is the only nonunion certifying entity in the state. To be certified, applicants must pass NCCCO's written and practical exams. NCCCO contracted with respondent International Assessment Institute (IAI) to develop and administer the exams.

Appellant John Nypl owns and operates appellant California Crane School, Inc. (CCS), a training facility for those seeking to pass NCCCO's operator

certification exams. Nypl improperly obtained copies of NCCCO's secure exams and used them to train CCS's students. NCCCO sued Nypl and CCS. To settle the action, Nypl and CCS agreed to be subject to administrative sanctions that precluded Nypl from acting as a test site coordinator and practical examiner and barred CCS from being listed as a training facility on the NCCCO Web site. According to respondents, CCS and Nypl repeatedly engaged in conduct to circumvent the sanctions. According to appellants, after Nypl refused to join a price-fixing agreement with competing schools, most of whom control NCCCO, NCCCO and IAI blocked Nypl's legitimate attempts to operate CCS despite the sanctions. Appellants alleged that respondents' concerted refusals to deal with them constituted an illegal boycott.

Appellants sued respondents for Cartwright Antitrust Act (Bus. & Prof. Code,[1] § 16700 et seq.; Cartwright Act) violations, unfair competition and related business torts. The court sustained demurrers to the Cartwright Act and unfair competition claims and the jury found for respondents on the remaining interference with business relationships claim.

Appellants appeal contending (1) the court erred in sustaining the demurrer because the complaint alleged an illegal group boycott;[2] (2) the court abused its discretion in refusing appellants sufficient time to put on their case; (3) the court erred in admitting evidence of appellants' misconduct that was "[r]eleased and [d]ischarged" pursuant to the settlement agreement; and (4) the court erred in instructing the jury in six regards.

We will set forth the trial evidence and address the trial issues first. We will then address the order sustaining the demurrers. We will affirm as to the trial issues; we will reverse the ruling on the demurrer to the antitrust causes of action.

## I. FACTS AND PROCEDURAL HISTORY*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[1] Further statutory references are to the Business and Professions Code unless stated otherwise.

[2] Appellants do not challenge the trial court's decision to sustain the demurrer to their unfair competition and false advertising cause of action.

*See footnote, *ante*, page 12.

## II. DISCUSSION

### A. *Trial Issues*

#### 1. *Limiting Trial Time*

According to appellants, the court decided, unilaterally and over the objections of both parties, to limit the trial to 10 days. As a result of the unreasonable time limit, appellants were unable to call all of their witnesses or present rebuttal evidence, and were thus deprived of a fair trial. (*Kelly v. New West Federal Savings* (1996) 49 Cal.App.4th 659, 677 [56 Cal.Rptr.2d 803].) According to respondents, the court provided ample warning that the trial would be scheduled as it was and merely exercised its inherent authority to reasonably control the proceedings. (*Ellis v. Roshei Corp.* (1983) 143 Cal.App.3d 642, 648–649 [192 Cal.Rptr. 57].) We find no abuse of discretion or deprivation of a fair trial.

##### a. *Relevant facts*

Appellants' time estimate in their pretrial brief was four to six weeks. But, during pretrial discussions, the court told the parties that trial should last no more than nine or 10 days. The court reasoned that pretrial rulings had narrowed the issues and reduced the case to Nypl's and CCS's two related interference causes of action against NCCCO and IAI. Appellants' counsel replied that nine days was "optimistic," but made no comment in response to the court's concluding statement, "given the narrowing of the issues here, I think we can do it in that time. So that's going to be the target; nine to ten days, okay."

When the court ruled against appellants on an in limine motion, they reported they would need an additional half or full day to respond to the evidence respondents were permitted to introduce from the federal court proceedings. The court agreed to a 12-day trial.

The slow pace of counsel for appellants was apparent from the start. Appellants' counsel argued during opening statement, for which the court admonished him, and he exceeded the allotted time for opening statement. At the end of the first day of testimony, respondents' counsel expressed concern that appellants had not completed even one of their 30-some proposed witnesses. Appellants' counsel replied that the first witness was always longer and appellants had only three "major" witnesses: Mitchell, who was on the stand, Brent, and Nypl. The court reiterated that the trial would last 12 days total, divided between the two sides.

Later, the parties agreed respondents would "get the case" on the morning of the eighth day of trial. Subsequently, they agreed respondents would get the case at noon that day. Late on the afternoon of the seventh day of trial, when appellants were examining Nypl and indicated they had additional direct examination for the next morning, the court stated they were "kind of under the gun tomorrow." Respondents argued that appellants were taking three and four times their time estimates to examine their witnesses. Appellants stated they were doing their best, but needed more time to put on their witnesses.

The court concluded, "I think you guys should have thought about this when you spent two-and-a-half days on Mr. Mitchell . . . . I mean that seems to be excessive considering the amount of time you guys agreed it would take to put your case on. I gave you two extra days and you used two-and-a-half days on one witness. It doesn't make me particularly sympathetic to your plight. [¶] So I'm going to stick with my schedule. I told you it wasn't chiseled in stone. I'm going to see what happens. But tomorrow at noon I want [respondents] to have their case." Counsel for appellants asked if they should have all of their witnesses present the next morning. The court responded, "You should have as many as you think you can get on between now and noon tomorrow."

On the morning of the eighth day of trial, appellants completed their direct examination of Nypl and respondents spent the rest of the morning cross-examining him. Appellants were permitted to call an additional expert witness that afternoon, and a final witness, Danny Matranga, on the afternoon of the ninth day of trial.

On the morning of the 10th day of trial, the court granted respondents' motion for nonsuit on appellants' interference with contract claim and denied it as to the interference with business relationships claim. The court told the parties the case had to go to the jury the next day or they would lose a juror who had a planned vacation. Respondents continued with their case. That afternoon, respondents' counsel protested that appellants' counsel was taking more time cross-examining respondents' witnesses than respondents were taking with direct examination. Appellants' counsel protested that was not true and the court completed the discussion off the record.

When additional juror scheduling problems came to light, the parties agreed to limit closing argument to one hour each. Before the case went to the jury, appellants objected that they had not been permitted to rebut respondents' evidence, which they could have rebutted. It also came to light that appellants had not moved certain exhibits into evidence. The court asked why they had not moved them into evidence before they rested. Appellants'

counsel replied, they had not rested because "we had Hornauer." The court replied, "You testified [*sic*] when I told you your last witness was done, I told you you were not going to put him on if your last witness was Mr. Matranga, and you didn't move him into evidence."

The case was argued to the jury late on the afternoon of the 11th day of trial and the jury deliberated and reached a verdict on the 12th day of trial.

### b. *Rationale*

Judges who preside over trials, especially jury trials, wear many hats and have numerous responsibilities. In addition to ruling on all questions of law and procedure, and sometimes deciding factual issues, they are responsible for ensuring the security of those who appear in court, that attorneys meet certain professional and ethical standards of behavior, that court staff fulfill their responsibilities, that juries are properly cared for and that all court cases assigned to them are fairly and efficiently heard and decided. It is these last two functions that are at issue when a trial judge imposes trial time limits.

Some litigants are of the mistaken opinion that when they are assigned to a court for trial they have *camping rights*. This view presumes that the trial judge must defer to the lawyers' time estimates for the conduct of the trial such that, for example, when examining witnesses, unless a valid objection is made by one's opponent, a party is entitled to take whatever time it believes necessary to question each witness. This view is not only contrary to law but undermines a trial judge's obligation to be protective of the court's time and resources as well as the time and interests of trial witnesses, jurors and other litigants waiting in line to have their cases assigned to a courtroom.[3] The Evidence Code expressly empowers trial judges to limit the presentation of evidence, even evidence that is relevant and probative. Evidence Code section 352 authorizes the court to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate *undue consumption of time*. Evidence Code section 765, subdivision (a) provides that the court *shall* exercise control over the mode of interrogation of witnesses "so as to make interrogation as rapid, as distinct,

---

[3] The Trial Court Delay Reduction Act was enacted to encourage prompt disposition of all matters coming before the courts. (Gov. Code, § 68600 et seq.) Standard 2.1(a) of the California Standards of Judicial Administration provides: "Trial courts should be guided by the general principle that from the commencement of litigation to its resolution, whether by trial or settlement, any elapsed time other than reasonably required for pleadings, discovery, preparation, and court events is unacceptable and should be eliminated." Canon 3B(8) of the California Code of Judicial Ethics provides: "A judge shall dispose of all judicial matters fairly, promptly, and efficiently. A judge shall manage the courtroom in a manner that provides all litigants the opportunity to have their matters fairly adjudicated in accordance with the law."

and as effective for the ascertainment of truth." Both statutes describe powers that the court may exercise on its own initiative.

■ It is incumbent upon trial judges to manage trials efficiently. Efficiency is not necessarily measured by comparing the actual length of a trial with the parties' original time estimate because parties often overestimate or underestimate a trial's length. Judges need to be proactive from the start in both assessing what a reasonable trial time estimate is and in monitoring the trial's progress so that the case proceeds smoothly without delay. A trial department that goes *dark* because the parties have *run out of witnesses* for the day is an example of an unwarranted delay. Witnesses should be available at all times.[4] It is clearly preferable to inconvenience one or more witnesses standing by in the hallway than to bring a trial to a halt because no witnesses are available. When a trial stops for that reason, it adversely impacts the time and resources of the court, jurors, parties and attorneys, not to mention those litigants waiting for a courtroom to open up for their case. Trial time management is an ongoing responsibility of the trial judge, regardless of the case's complexity, the number of witnesses called or whether specific time limits have been imposed.

### c. *Procedure*

■ For those cases in which the trial judge believes time limits should be set, the court should first elicit estimates from the parties and invite each side to comment on the other's estimate. Once the parties have presented their views, the court should independently evaluate the estimates based on the arguments of the parties, the state of the pleadings, the legal and factual issues presented, the number of witnesses likely to testify, the court's trial schedule and hours, and the court's experience in trying similar cases.

Time limits may be stated in terms of court *days* or court *hours*. One difficulty with using court days is that the length of time that a court is in session on any given day may vary depending on unanticipated interruptions or delays (e.g., juror tardiness, matters taken up outside the presence of the jury, other court business that interrupts the trial, etc.). Thus, one trial day may include six hours of testimony while another trial day may include only four hours. When court days are used, a portion of one party's time limit includes the time its opponent takes to cross-examine the first party's witnesses. Theoretically, a party's opponent could use up a substantial portion of the other party's time limit through lengthy cross-examination.

There are advantages to specifying time limits in court hours rather than court days. An hour time limit imposed on one side would include all time

---

[4] Some trial judges admonish parties at the outset that if they run out of witnesses, it is the equivalent of *resting*.

that party spends in examining its own witnesses (direct and redirect) as well as time spent in examining the adverse party's witnesses (cross and recross). It would include the time spent in delivering an opening statement and final argument. As contrasted with a time limit expressed in court days, an hour limit, as described, is not diminished by matters beyond the party's control, such as the amount of time an opponent uses to cross-examine said party's witnesses.[5] An hour time limit does carry the additional burden of requiring a timekeeper (judge or clerk) to keep an accurate account of the time spent by each side. The parties are entitled to be kept advised on a regular basis and upon request of how much time each side has used and has remaining.[6]

Regardless of whether court-imposed time limits are expressed in days or hours, any time limit order should be reasonable, mindful that each party is entitled to a full and fair opportunity to present its case. Trials are a dynamic process without the benefit of a dress rehearsal, which makes forecasting the length of a trial less than precise. But for those parties and attorneys who are fully prepared for trial and do not waste time with repetitive questioning, cumulative evidence, not having witnesses available, or not having documentary evidence organized and easily accessible, a trial's length is not an issue. Thus, despite the vagaries of trial, when all parties try a case diligently, there is no reason for time limits. In all other cases, time limits will provide incentive to be diligent.

Any limits imposed should be subject to revision (upward or downward) for good cause shown either on a party's or the court's own motion. For example, if one party decides not to call several witnesses on its original list or abandons some of its claims or defenses, or if the court dismisses some of a party's claims or defenses, the court would be justified in reducing that party's time allowance. On the other hand, if an unanticipated trial event causes a party to call additional witnesses not originally scheduled to testify, then the court would be justified in increasing that party's time allotment *provided* the court was given timely notice of the request, found that party's claim of surprise credible, determined that its surprise was not the result of inattention or lack of preparation and concluded that said party had otherwise managed its case in a diligent manner.

---

[5] If a plaintiff heedlessly exhausts its time limit during its case-in-chief, then it will have no time to cross-examine the defense witnesses. Similarly, if a defendant exhausts its time limit during its case-in-chief, then it will have no time to cross-examine any of the plaintiff's rebuttal witnesses.

[6] Of course, for purposes of advising the jury of the estimate time for their jury trial service, the trial judge would have to include, in addition to the time limits imposed on the parties, the estimated times for jury selection, anticipated hearings outside their presence, reading of jury instructions, jury deliberation, the number of hours each day that the trial will be in session, etc.

Not all cases are suitable for the imposition of time limits. More often it is sufficient if the trial judge manages the trial in such a way that the trial proceeds efficiently without delays, repetition or dead time. However, in those cases in which the trial court imposes time limits, it is also important that those limits be enforced. If it appears that a party's allotted time may expire while it is still presenting evidence, the court and counsel should discuss ahead of time how the matter will be handled in front of the jury. The court should give counsel the choice of either allowing counsel to announce that its client has "rested" or having the court inform the jury that said party has exceeded the time limits imposed by the court and therefore it may not present any additional evidence. It would be potentially prejudicial to one side who abided by the time limits if the court were to relax the limits for the other. Courts should not make orders they are not willing to enforce.[7]

### d. *The law*

■ A trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it. (*People v. Engram* (2010) 50 Cal.4th 1131, 1146 [116 Cal.Rptr.3d 762, 240 P.3d 237]; Code Civ. Proc., § 128.)[8] This authority includes the power to supervise proceedings for the orderly conduct of the court's business and to guard against inept procedures and unnecessary indulgences that tend to delay the conduct of its proceedings. (*Ellis v. Roshei Corp., supra,* 143 Cal.App.3d at pp. 648–649.) In this vein, the court has the power to expedite proceedings which, in the court's view, are dragging on too long without significantly aiding the trier of fact. (*Germ v. City & County of San Francisco* (1950) 99 Cal.App.2d 404, 424 [222 P.2d 122].) But a court need not wait until a trial has been unduly prolonged before it takes measures to expedite the proceeding. We believe it is clearly within the power of the court to impose time limits before the trial commences. Finally, the court is vested with discretion over the scope of rebuttal, and its ruling will not be disturbed on appeal absent an abuse of discretion. (*Ray v. Jackson* (1963) 219 Cal.App.2d 445, 454 [33 Cal.Rptr. 339].)

However, the court must permit a party to have his day in court. Denying a party the right to testify or offer evidence deprives him of a fair trial and

---

[7] Just as it would be improper to comment on a court's evidentiary ruling, it would be improper for counsel to comment on the court's time limit order in front of the jury.

[8] The federal courts likewise recognize and approve a trial court's authority to set reasonable time limits for the conduct of a trial. "Trial courts have broad authority to impose reasonable time limits. [Citation.] Such limits are useful to 'prevent undue delay, waste of time, or needless presentation of cumulative evidence.' [Citation.] While trial courts have discretion to expedite the completion of trials, 'they must not adhere so rigidly to time limits as to sacrifice justice in the name of efficiency.' *Gen. Signal Corp. v. MCI Telecomm. Corp.,* 66 F.3d 1500, 1509 (9th Cir. 1995)." (*Navellier v. Sletten* (9th Cir. 2001) 262 F.3d 923, 941–942.)

constitutes reversible error. (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 291 [77 Cal.Rptr.3d 305] (*Carlsson*).) In *Carlsson*, the trial court erred by abruptly ending the trial in the middle of a witness's testimony during the appellant's case-in-chief and without giving him an opportunity to complete the presentation of evidence or offer rebuttal evidence. (*Ibid.*; accord, *Bole v. Bole* (1946) 76 Cal.App.2d 344, 346 [172 P.2d 936] [court erred by refusing to require the plaintiff wife to bring son to testify as a witness for the defendant husband and in excluding evidence tending to show the character of the husband's mother-in-law, which would have supported his refusal to permit her into his home]; *Fewel v. Fewel* (1943) 23 Cal.2d 431, 433 [144 P.2d 592] [court erred by modifying a custody order based on the bare recommendation of the court investigator and precluding the plaintiff from cross-examining the investigator or presenting evidence]; *Kelly v. New West Federal Savings, supra,* 49 Cal.App.4th at p. 677 [court erred in granting motions in limine that prevented the plaintiffs from offering evidence to establish their case].)

e. *Analysis*

The trial court did not abuse its discretion in controlling the trial proceedings as it did. The case went to trial on only Nypl's and CCS's two related business interference tort claims against NCCCO and IAI. The trial court reasonably set aside nine to 10 days for trial and notified both sides of this timeframe. While appellants stated the timeframe was "optimistic," they did not object or provide any rationale why the trial could not be completed within that time period.

Further, the reasonable inference from the record is that appellants were unable to present rebuttal evidence because they did not manage their case-in-chief in a manner that permitted time for rebuttal. Appellants called Mitchell, IAI's president, as their first witness. After a full day of direct examination, counsel stated he had "about an hour or maybe more," thus suggesting that additional witnesses would be called the next day. However, appellants kept Mitchell on the stand for an additional two days and did not examine their second witness, Brent, until the morning of the fourth day of testimony. Brent was on the stand for two days before appellants called their third witness, Nypl, on the seventh day of testimony. They completed Nypl's direct examination on the morning of the eighth day of testimony and respondents began their case-in-chief at noon that day. Appellants thus spent almost seven days examining three witnesses.[9] In addition, appellants were permitted to call an expert witness briefly on the afternoon of the eighth day, and a final witness, Matranga, on the afternoon of the ninth day of trial. By

---

[9] Appellants also examined their damages expert during that time.

way of comparison, respondents began their case-in-chief on the afternoon of the eighth day and the case went to the jury late on the 11th day of testimony.

Appellants submit they were unable to call witnesses Timothy Maxwell, Wes Staley, Joshua Larsen, Robert Hornauer, Jared Maxwell, Vladimir Nypl, Robert Scott, and "[o]ther [v]ictims of the [b]oycott," who would have testified to the nature and effect of the boycott that constituted the wrongful interference with appellants' business relationships, which were at issue at trial. Appellants also contend they were unable to rebut testimony regarding nonparty Robert Scott's questionable integrity, the number of accredited practical examiners available in the state, Nypl's "practice" of placing test answers on the testing room walls,[10] and respondents' expert's testimony regarding damages.

■ The record does not support appellants' claim that the trial court abused its discretion in supervising the timing of the trial. Rather than calling their own party witnesses, appellants called Mitchell and Brent as adverse witnesses to present their case. When Mitchell and Brent gave reasoned testimony as to why the individual appellants had not been permitted to serve as NCCCO testers, rather than calling the individual appellants to present their claims, counsel kept adverse witnesses Mitchell and Brent on the stand for five of appellants' allotted trial days. Under the circumstances, the trial court did not abuse its discretion in holding appellants to the trial schedule.

A judgment will not be reversed due to the erroneous exclusion of evidence unless it appears, upon examining the entire cause, including the evidence, a miscarriage of justice has resulted. (Cal. Const., art. VI, § 13; Evid. Code, § 354.) A miscarriage of justice occurs only when the reviewing court is convinced it is reasonably probable a result more favorable to the appellant would have been reached absent the error. (*In re Marriage of Smith* (1978) 79 Cal.App.3d 725, 750–751 [145 Cal.Rptr. 205].) In light of the record evidence and the jury finding that neither IAI nor NCCCO intended to interfere with Nypl's and CCS's economic relationships, we are not convinced it is reasonably probable a result more favorable to appellants would have been reached had the excluded evidence been admitted.

2., 3.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

[10] The actual testimony was he had done so once.
[*]See footnote, *ante*, page 12.

B. *Demurrer**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The order of March 24, 2010, sustaining respondents' demurrer to the Cartwright Act violation/illegal trust cause of action is reversed. The case is remanded to the trial court with directions to overrule respondents' demurrer to the Cartwright Act and illegal trust causes of action. In all other respects, the judgment is affirmed. The parties shall bear their own costs on appeal.

Poochigian, J., and Franson, J., concurred.

---

*See footnote, *ante*, page 12.