Filed 11/13/14  Skamangas v. Lai CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALISON SKAMANGAS,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>DONALD LAI,<br><br>        Defendant and Respondent. | A133536<br><br>(Alameda County<br>Super. Ct. No. VG09438029) |

Alison Skamangas brought this medical malpractice action against Donald Lai, M.D., for the care he provided to her husband, Peter, after Peter suffered a heart attack.[1] The jury rendered a verdict in favor of Dr. Lai.  On appeal, Alison argues that the judgment must be reversed because the trial transcript is inadequate, the verdict is supported by insufficient evidence, Dr. Lai's counsel engaged in trial misconduct, evidence of Peter's stock options was improperly introduced into evidence, and time limits on introducing evidence and presenting closing arguments were improperly set. We are not persuaded by these arguments and affirm.

---

[1] Because Alison and Peter share the same surname, we shall refer to them by their first names for the sake of clarity and readability.  We intend no disrespect in doing so.

1

## I.
### BACKGROUND

Peter suffered a type of heart attack known as a right ventricular infarction (RVI), and he died after being treated by Dr. Lai at ValleyCare Medical Center. After his death, Alison brought this action for medical malpractice.

Alison's case against Dr. Lai was tried before a jury, and several proceedings and rulings occurred during the trial that are relevant to the issues raised on appeal. First, competing expert testimony was presented on whether Dr. Lai's care for Peter was negligent. Richard Terry, M.D., testified on behalf of Dr. Lai, while Jay Schapira, M.D., and James Leo, M.D., testified on behalf of Alison. Second, counsel for Dr. Lai made comments and posed questions during the trial that Alison contends were inappropriate. Third, evidence was introduced in connection with Alison's alleged damages about Peter's vested and nonvested stock options. And, finally, the trial court discussed the timing of closing arguments and deliberations with the jury after the close of the evidence.

The jury found in favor of Dr. Lai.

## II.
### DISCUSSION

*A.     Prior Orders Establish the Adequacy of the Trial Transcript.*

Alison preliminarily argues that the trial transcript is incomplete and inaccurate. We have previously considered and rejected three motions by her for relief based on transcript inadequacies, and we decline to rule otherwise now.

Alison's first motion challenging the adequacy of the transcript was filed in December 2012, and it asked us to vacate the judgment. We denied the motion in March 2013, but we remanded the matter to the trial court to resolve any issues with the transcript. We received a supplemental transcript in December 2013. A month later, in January 2014, Alison filed a renewed motion to vacate the judgment, again arguing the transcript was inadequate. We denied the motion, holding that Alison failed to show she was entitled to relief under the relevant statute, Code of Civil Procedure section 914.

2

Alison then filed a motion for reconsideration or for an order requiring the reporter to appear at a hearing. We denied this motion as well.

In her briefs, Alison argues for the fourth time that she is entitled to relief because of transcript inadequacies. We conclude that the issue has been settled and that Alison's argument remains unmeritorious.

We may vacate a judgment in the event "of the loss or destruction, in whole or in substantial part, of the notes of [the trial] reporter." (Code Civ. Proc., § 914.) Here, the trial transcript is over 1,600 pages, and there is no indication a substantial part of it is missing. Rather, Alison vaguely references a number of minor typographical errors and contends that the transcript is inconsistent with her personal recollection. This is insufficient to establish the loss or destruction of a substantial part of the transcript. Moreover, as we explain below, we would sustain the judgment even if we were to assume that Alison's recollections of the lower court proceedings are true and accurate.

B.      *Substantial Evidence Supports the Jury's Verdict.*

Alison asserts that the jury's verdict was contrary to the overwhelming weight of the evidence. She contends that Dr. Lai was negligent in treating Peter because he (1) administered nitroglycerin to Peter after failing to properly diagnose him with an RVI, (2) failed to intubate Peter during a code blue,[2] and (3) failed to perform thrombo-aspiration before deploying stents and balloons to open Peter's arteries.

In reviewing these contentions, we apply the substantial-evidence rule. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 859.) In doing so, we " 'must view the whole record in a light most favorable to the judgment, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the decision of the trial court.' " (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.) " 'We may not substitute our view of the correct findings for those of the [jury]; rather, we must accept any reasonable interpretation of the evidence which supports the [jury]'s decision.' " (*Ibid.*) Substantial evidence is "evidence of ponderable legal significance, evidence that is

---

[2] The term "code blue" is generally used to indicate that a patient requires resuscitation or otherwise needs immediate medical attention.

reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) Where, as here, the party with the burden of proof at trial appeals the verdict on the ground there was insufficient evidence, "the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, quoting *Roesch v. De Mota* (1944) 24 Cal.2d 563, 571.)

Applying these standards, we conclude that substantial evidence supports the jury's verdict. In support of Alison's first contention—that Dr. Lai negligently administered nitroglycerin to Peter—Dr. Schapira testified that nitroglycerin is contraindicated for an RVI because it lowers blood pressure. But he was not the only expert to testify on the issue. Dr. Lai's expert, Dr. Terry, opined that Dr. Lai met or exceeded the applicable standards of care. He believed that Dr. Lai's treatment approach should have been the same even if Peter had an RVI. According to Dr. Terry, the treatment goal in a case such as Peter's is to open the occluded artery as soon as possible, and Dr. Lai properly did what he could to do so.

Dr. Schapira testified that nitroglycerin is contraindicated for RVIs since this form of a heart attack can reduce the patient's blood pressure, i.e., make the patient hypotensive. But it was reasonable for the jury to conclude that the drug was not contraindicated in Peter's case. Dr. Lai testified that nitroglycerin can be given to a patient, even one who suffered an RVI, so long as the patient has adequate blood pressure.[3] Dr. Terry testified that it was "certainly appropriate" for Dr. Lai to administer nitroglycerin because Peter had high blood pressure during the relevant period. And

---

[3] At trial, Alison's counsel asked Dr. Lai whether nitroglycerin is contraindicated for an RVI. Dr. Lai's counsel objected on the ground that the question called for expert opinion, and the trial court sustained the objection. Alison now argues that the ruling was in error. We conclude that even if the ruling was erroneous, it was not prejudicial since Dr. Lai had already answered the question by testifying that nitroglycerin was contraindicated for an RVI only if the patient had low blood pressure. Moreover, Alison had and exercised ample opportunity to present contrary evidence.

4

Howard Yoshioka, M.D., a physician who evaluated Peter in the emergency room, testified that whether nitroglycerin is contraindicated for treatment of an RVI "depends completely on the patient's scenario."[4]

At trial, the experts disagreed whether Peter's blood pressure was accurately measured and when Peter became hypotensive. Dr. Schapira testified that Dr. Lai should have used an intra-aortic blood pressure device since it would have shown Peter's low blood pressure, while Dr. Terry testified that Dr. Lai properly used an external blood pressure cuff. Dr. Terry testified that Peter had high blood pressure when he was admitted to the hospital and continued to have high blood pressure until Dr. Lai opened up his coronary artery, at which point Dr. Lai stopped the nitroglycerin. Viewing the totality of this evidence in the light most favorable to the judgment, we conclude that the jury could have reasonably found Dr. Lai's use of nitroglycerin to have been consistent with the standard of care.

Alison's second contention is that Dr. Lai negligently failed to intubate Peter when he lost consciousness and suffered seizure-like activity. The emergency physician on duty called a code blue so Peter could be intubated. But when Peter regained consciousness, Dr. Lai cancelled the code. Dr. Leo, another one of Alison's experts, testified that the failure to intubate Peter significantly contributed to his death because it allowed him to aspirate vomit, which in turn resulted in aspiration pneumonia, lung damage, sepsis, septic shock, and multiple organ failure. But at trial, Dr. Terry testified that there were valid reasons not to intubate Peter at the time of the code blue. He opined that intubating Peter would have placed increased stress on his heart, created its own risk

---

[4] Alison also argues that the U.S. Food and Drug Administration (FDA) has cautioned that certain drugs administered to her husband can cause low blood pressure and hypotension. She asserts that she introduced extensive evidence concerning the FDA warnings at trial, but the court reporter failed to transcribe them. It appears that Alison is mistaken about the introduction of this evidence. As Dr. Lai pointed out in his opposition to Alison's renewed motion to vacate the judgment, the FDA evidence was related to Alison's claims against the hospital. These claims were dismissed prior to trial. In any event, even if this evidence had been introduced, there does not appear to be any dispute that Peter was administered medications that can reduce blood pressure.

of inducing vomiting, and presented other difficulties because Peter was conscious.[5] It was not unreasonable for the jury to side with Dr. Terry even though Alison offered two contrary expert opinions. Moreover, Alison places too much weight on hindsight. Although intubation might have prevented Peter from contracting aspiration pneumonia, it is far from clear that aspiration pneumonia was or should have been Dr. Lai's primary concern at the time of the code blue.

Alison's third contention is that Dr. Lai negligently waited to use a procedure known as thrombo-aspiration until after he deployed stents and balloons to open Peter's arteries. Dr. Schapira explained that thrombo-aspiration is a procedure whereby a Pronto catheter is used to create a vacuum that sucks out blood clots. He testified that the procedure should be done first because it permits the doctor to pull out "large chunks of clot" before placing the stents. Dr. Schapira testified that Dr. Lai's deployment of stents and balloons before using the Pronto catheter caused downstream embolization and blockage of collateral blood vessels.

But again, conflicting evidence was presented. Dr. Terry testified that the circumstances at the time prevented Dr. Lai from being able to remove the clot without first deploying stents and balloons. He explained that Dr. Lai had been unable to thread a middle-weight wire through the obstruction in Peter's artery, and this meant it was unlikely Dr. Lai would have been able to get a larger catheter past the obstruction without pushing the clot downstream.

Although the expert testimony presented by Alison might be credible and reasonable, our inquiry is whether that testimony was uncontradicted or left no room for a

---

[5] Alison argues that Dr. Terry's statements were not credible because of inconsistencies between his trial and deposition testimonies and because he had reviewed the records of only five or six related cases. But on substantial evidence review, credibility determinations are the "exclusive province" of the jury. (*Daly v. Wallace* (1965) 234 Cal.App.2d 689, 692, italics omitted.)

6

contrary finding.  (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.)  It was neither.[6]

Accordingly, we conclude that substantial evidence supports the verdict.

        *C.      Dr. Lai's Counsel Did Not Engage in Misconduct.*

        Alison argues that Dr. Lai's counsel engaged in prejudicial misconduct in several ways.  First, she contends that counsel implied there were problems in her marriage by introducing evidence and argument that she once told Peter, "[Y]ou can just move in over there [his office], because you work there all the time."  Second, she contends that counsel improperly questioned her about her activities after Peter's death.  Third, she contends that counsel improperly inflamed "social and economic prejudices of the jury" by cross-examining Dr. Schapira about his curriculum vitae, his publications, other parties for whom he had testified, the location of his practice in Beverly Hills, his income, the income of his hospital, and its reputation as the "hospital to the stars."  She also argues that counsel improperly cross-examined Dr. Schapira about mistakes or inconsistencies in a declaration he had submitted on summary judgment.  Finally, she contends that counsel reiterated many of these improper comments in his closing statements.

        These arguments were waived because Alison's trial counsel did not object to these comments or questions at trial.  (See Evid. Code, § 353, subd. (a).)  Furthermore, even if the arguments had been preserved, we would reject them because the comments and questions were proper, their probative value outweighed any danger of undue

---

[6] Alison also argues that the jury must have failed to properly consider all of the evidence because it returned a verdict in under two hours and did not request to review any of the trial exhibits.  But uncorroborated speculation concerning the jurors' mental processes is insufficient to impugn the validity of the verdict.  (Cf. Evid. Code § 1150 ["Upon an inquiry as to the validity of a verdict, . . . [n]o evidence is admissible to show the effect of [a] statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined"];  *People v. Hutchinson* (1969) 71 Cal.2d 342, 350 ["The only improper influences that may be proved under section 1150 to impeach a verdict . . . are those open to sight, hearing, and the other senses and thus subject to corroboration"].)

prejudice (see Evid. Code, § 352), and it is unlikely the jury's verdict was affected by them. (See Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).)

Counsel's comment about Peter's work at his office, when viewed in context, was offered as background information about Peter's health. Counsel's cross-examination of Alison about her activities following Peter's death was not improper since Alison's own counsel had questioned her about similar activities on direct examination. And Dr. Schapira's qualifications, biases, and credibility were fair game on cross examination, as were any inconsistencies between his trial testimony and his earlier declaration. Finally, Dr. Lai's closing statements do not appear in the reporter's transcript so it is not apparent whether the comments and questions were reiterated in closing argument. But, as we have discussed, there was nothing improper about the comments and questions, and Alison cannot remember the substance of any additional allegedly improper comments. We decline to reverse based solely on a vague assertion that defense counsel's closing argument was improper, especially since counsel's closing argument was not mentioned in Alison's designation of the record or renewed motion to vacate the judgment.[7]

D.      *The Trial Court Properly Allowed Evidence Concerning Stock Options.*

Alison argues that the trial court erred by allowing the introduction of evidence concerning Peter's stock options. We disagree.

Before trial, Alison filed a motion in limine to bar evidence and argument related to certain stock options. The trial court excluded evidence of options that vested prior to Peter's death and that had been exercised by Alison because these options would not have affected any damages suffered by Alison resulting from Peter's death.

---

[7] Alison's reliance on *People v. Apalatequi* (1978) 82 Cal.App.3d 970 is unavailing. In that case, the court vacated a guilty verdict where the defendant asserted there was prosecutorial misconduct during closing statements, and the court reporter lost her notes of those statements. (*Id.* at pp. 971-972, 974.) Even if we assume that this standard applies in civil cases, the facts are distinguishable. In *Apalatequi*, defense counsel recalled with specificity the misconduct and the objections made to it, and the court expressed its inclination to find prosecutorial misconduct if the statement was true. (*Id.* at pp. 973-974.) Here, the only alleged misconduct that Alison can recall was not objected to and does not raise grounds for reversal.

At trial, Alison called Patrick Mason, Ph.D., a forensic economist, to testify regarding her damages. Dr. Mason included in his damage calculations the value of 10,000 stock options that Alison purportedly lost because of Peter's death. Dr. Lai called his own economist, Jerald Udinsky, Ph.D., to rebut Dr. Mason's testimony. Dr. Udinsky testified that Dr. Mason's calculations were incorrect, because 2,500 of the 10,000 stock options vested before Peter's death.

Alison argues that Dr. Udinsky's testimony violated the trial court's order on the motion in limine and that the testimony was somehow prejudicial because it revealed that she is wealthy. She also asserts that the court reporter failed to record her objections to this testimony. Regardless whether Alison waived the argument by failing to object below, her argument lacks merit. Evidence undermining Dr. Mason's damage calculations was relevant, and there was little risk it would unduly prejudice Alison, especially since her own expert, Dr. Mason, had already introduced evidence concerning Peter's income and earnings. (See Evid. Code, § 352.) And it is not reasonably probable the jury would have reached a different verdict on liability if Dr. Mason's testimony on damages had been excluded. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

E.     *The Trial Court Did Not Impose Improper Time Limits.*

Finally, Alison argues that the court erred by placing limits on the number of trial days and the time for closing arguments. Alison cites to only two specific instances in the record: (1) the trial court's discussion of scheduling issues with the jurors after the close of evidence, and (2) a statement by the trial court that the jurors should eat lunch before closing arguments because the court "wanted to get this finished." Alison claims that the reporter failed to transcribe other instances where the trial court made comments to the jurors about when their service would be complete.

But these claims establish neither error nor prejudice. The trial court had the discretion to set such time limits (see *California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 20-24; *Ackerman v. Griggs* (1930) 109 Cal.App. 365, 369), and there is no indication the trial court abused its discretion. Alison fails to explain with specificity why any of the alleged limits was

9

wrong, and she identifies no evidence or arguments she was precluded from presenting on account of the limits.  She concedes that the trial lasted several weeks, and the record reflects that her trial counsel finished his closing arguments within the time limits set by the court.

## III.
### DISPOSITION

The judgment is affirmed.

10

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Banke, J.