Filed 7/8/22 Yin v. Li CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SHUANGLING YIN,<br><br>        Respondent,<br><br>v.<br><br>QIAOCHU LI,<br><br>        Appellant. | H048173<br>(Santa Clara County<br> Super. Ct. No. 18-DV-000979) |

Qiaochu Aaron Li appeals from mutual domestic violence restraining orders issued after hearing. He raises various statutory challenges to the order restraining him from his ex-girlfriend, Shuangling Yin. He also contends the trial court abused its discretion in the manner in which it conducted the trial and considered the evidence, and he claims error in the handling of his new trial motion. For the reasons stated here, we will affirm the orders.

## I. BACKGROUND

*Restraining Order Requests*

In December 2018, an attorney for Shuangling Yin filed a request for a domestic violence restraining order against her ex-boyfriend, Qiaochu Aaron Li. Yin's supporting declaration described harassing conduct by Li following their summer breakup, an incident in October which culminated in Li's arrest at a Starbucks cafe, and continued inappropriate conduct afterward. Five days later, Li filed his own request for a domestic violence restraining order seeking protection from Yin for himself and a coworker whom

he had also dated. Li's supporting declaration focused on an incident in August 2018 when Yin went to his workplace uninvited and physically assaulted him.

The court issued temporary restraining orders, and a hearing was scheduled for January 2019. Li retained counsel, and the matter was continued to June and then August 2019. Li's attorney withdrew in July 2019, and Li represented himself for the remainder of the proceedings. In August the court authorized Li to depose Yin and her boyfriend, ordered discovery to conclude by December, and continued the trial to January 2020.

*Short Cause Trial*

Li and Yin testified at trial. Li called as witnesses his coworker, a Starbucks employee who saw some of the October incident, and a friend who was present during a video call between Li and Yin after the October incident. The court admitted the deposition testimony of the receptionist at Li's workplace who observed the August incident, and some text messages and video chat history from September 2018. We summarize the evidence here in the light most favorable to the trial court's ruling. (*Melissa G. v. Raymond M.* (2018) 27 Cal.App.5th 360, 373–374 (*Melissa G.*).)

Li and Yin dated for about eight months. They broke up and reconciled several times. In August 2018, Yin confronted Li at his place of work. She was sad and angry over their most recent break up, and she entered his office uninvited and upset. The receptionist observed Yin hitting and cursing at Li. Yin was crying, and struck Li in the face and head using her hands. Li remained calm, told the receptionist not to call the police, and he and Yin went outside to talk. Li related that he had bruises on his head, abdomen, and arms from the incident, and he experienced slower thinking and depression. He saw a doctor and made a police report of the incident in December 2018, and he was fearful of Yin.

The parties continued to communicate (in Mandarin and English) by text and video calls in 2018. In September 2018, Li texted Yin using temporary numbers after Yin had blocked his personal cell phone number. In one of those exchanges, Yin texted,

2

"If you have no feelings [for me] now can you just stop bothering me?" Li said he contacted Yin at that time "because she acted like she was really angry and I was afraid of making her more angry." During a text exchange the following week, Li commented on Yin's relationship with her new boyfriend. As translated by Yin, Li texted, "Your relationship with your coworker [] is an extremely dangerous hidden danger. [¶…¶] Others can see what's going on. […] Don't wait until you lose your job, lose your friends and get a bad reputation, and regret then. Plus even your work visa might be indirectly affected by it."[1]

A second physical clash occurred in October 2018. Li went to Yin's home uninvited, left because Yin was not home, and returned a short while later after Yin returned with her boyfriend. Yin told Li he shouldn't come to her home because they had broken up. Li insisted on talking with Yin alone, and "wouldn't let it go." Li and Yin went to a park where they talked, and from there they went to a Starbucks where Yin's boyfriend was waiting. Yin suggested meeting at Starbucks because "it is a public place, and I think it helps for everybody to calm down in a public place."

Li had threatened Yin's boyfriend before, and as they approached Starbucks Li told Yin he "would win" if he had to fight Yin's boyfriend. Yin's boyfriend was outside the cafe, and Li told Yin to go inside. Yin was afraid for her boyfriend, so she refused and asked Li why he wanted her to go inside. Li said, " '[b]ecause there is something you might not want to see outside.' " Li kept yelling at Yin to go inside, she would not comply, and he started pushing her toward the door. He pushed her back against the door, and he continued to push. Li grabbed Yin by the forearm, and Yin flailed her arm

---

[1] Alternatively to Yin's translation, Li translated the message as: the "[r]elationship between you and your colleague is a very troublesome issue, hidden issue. … I'm telling you very sincerely others see it. And when there's something that goes wrong or they're unhappy about something, problems may arise. [¶…¶] [D]on't get into a situation when friends are lost or reputation[s] are damaged or jobs are at risk. … And, in addition, the immigration status may be indirectly affected. At that time, it wouldn't be a matter just for dating."

away. Yin's boyfriend stepped in and pushed Li. Yin entered the cafe, and a confrontation between Li and Yin's boyfriend ensued outside. The police were called, and Li was taken into custody. At trial, Li denied pushing Yin.

Li had a friend sit with him during a two- to three-hour video call with Yin which occurred almost immediately following the October incident. The friend recalled general topics that were discussed in Mandarin, but not specific details. Li began the conversation by asking Yin if she was ok. They proceeded to discuss what happened at Starbucks, "followed by [Li] explaining some of the … implications of what all this is," and further discussion "based on what [Li] said."

Yin was initially sympathetic to Li's situation. She accompanied Li to an attorney's office because he wanted her to drop the case and she wanted to help him. But her position changed after reviewing the police report (which included a statement by Li that Yin had been violent in the past) and discussing the relationship with other attorneys. She decided the relationship was abusive and she needed to protect herself.

Li's behavior also disturbed Yin. Li contacted three or four of Yin's friends after the incident. About 10 days after the incident, Li went to the parking garage in Yin's apartment complex. Li knew Yin was upset after learning he told the police that Yin "beat me up." He knew she did not want to see him, so he told a friend he would wait in her garage for an hour should Yin wish to communicate. A few days later, concerned that he would be charged with domestic violence, Li texted a friend that "the worst case is she and I [¶…¶] both go to prison for four years for felony D.V." Yin also understood that Li had asked her friends for her parents' contact information.

*Trial Court Ruling*

The trial court found, as between the parties, that Yin testified "with complete candor" and was "more candid with the court" than Li. The court found that Li was not deliberately untruthful, but his effort to be "exactly accurate" caused him "to be somewhat misleading."

4

The trial court found that Yin committed an act of abuse in August 2018 when she went to Li's workplace uninvited and struck him, and that Yin was the "dominant aggressor" in that instance. The court credited Yin's version of the Starbucks encounter: Yin was "shoved" into the door, Li tried to grab at Yin and she moved her arm away; Yin then entered the cafe angry; and a "tussle" between Li and Yin's boyfriend occurred outside. The court found Li was the "dominant aggressor" in that instance.

The trial court found that Li committed acts of abuse culminating in October 2018. Li raised potential immigration consequences related to Yin's dating relationship with a coworker. On two occasions Li arrived at Yin's home uninvited. Yin sought a public place to engage with Li because she thought it would be safer. In a video conversation Li informed Yin of the potential consequences of a criminal prosecution, which the trial court noted could be perceived as trying to dissuade a witness. The court also expressed concern about Li communicating with Yin's friends.

The court found that although both parties had difficulty letting go of their relationship, Li's behavior was more troubling than Yin's because of Li's pattern of controlling and trying to force continued contact with Yin. The behavior was ongoing, became abusive, and Li lacked insight that it was inappropriate.

The court issued a one-year order protecting Li from Yin, and a three-year order protecting Yin from Li. (It found insufficient evidence to restrain Yin from contacting Li's coworker.) The court restrained Li for the longer period because of his compulsive behavior and to provide a sufficient period of separation.

Following the court's oral pronouncement, Li stated that he did not have the opportunity to testify "to other occasions of physical violence." The court responded that it allowed an additional two and one-half hours for the hearing, it took into account Li's testimony regarding text messages he thought were threatening, and it granted his request for a restraining order. Li asked that the order restraining Yin issue for three years. The court told Li he could petition to renew the order within three months of it expiring.

5

*New Trial Motion*

Li moved for a new trial, alleging errors under Family Code section 6305 and Penal Code section 836, subdivision (c)(3). Hearing on the motion, initially set for March 9, 2020, was reset to April 8 to provide Yin sufficient time to respond to Li's amended motion; it was then continued to May 20 due to the COVID-19 pandemic. The trial court denied Li's ex parte request to hear the matter on April 8 as scheduled, within the 75-day statutory timeframe. (Code Civ. Pro., § 660, subd. (c).) The court ruled that the motion could not be heard before May 1 due to the pandemic, and "deem[ed] tolled the statutory time limits … until such time as the motion may be heard."

The matter was reset to August 12, 2020, at which time the court ruled it had lost jurisdiction to decide the new trial motion. The superior court's emergency orders did not toll the 75-day period in which a new trial motion must be decided, nor grant authority for an individual judge to do so. The motion was thus denied by operation of law. (Code Civ. Proc., § 660, subd. (c).) The trial court apologized, stating "nothing could have been done" because civil new trial motions were not being heard earlier in the pandemic. The court explained at some length that it would have denied the motion had it ruled on the merits.

Li timely appeals from the mutual domestic violence restraining orders and from the denial of his new trial motion.

## II. DISCUSSION

We review the issuance of domestic violence restraining orders for an abuse of discretion, which is circumscribed by the legal principles governing the subject matter. (*J.J. v. M.F.* (2014) 223 Cal.App.4th 968, 975.) We review the trial court's factual findings supporting mutual restraining orders for substantial evidence. (*Ibid*.)

A restraining order may be issued under the Domestic Violence Prevention Act (Fam. Code, § 6200, et seq.; undesignated statutory references are to this code) "to prevent domestic violence or abuse" and to provide for a separation of persons "if the

6

party seeking the order 'shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse.' " (*Melissa G.*, *supra*, 27 Cal.App.5th 360, 367; §§ 6200; 6300, subd. (a).) "Domestic violence" is abuse perpetrated against persons including one with whom the respondent is having or has had a dating relationship. (§ 6211, subd. (c).) "Abuse" does not require the infliction of physical injury. (§ 6203, subd. (b).) It includes stalking, threatening, harassing, and making annoying telephone calls to the other party. (§§ 6203, subd. (a)(1), (4); 6320, subd. (a).) It also includes "disturbing the peace of the other party, " which refers to conduct that "destroys the mental or emotional calm of the other party." (§ 6320, subd. (c).) Such conduct "may be committed directly or indirectly, including through the use of a third party, and by any method or through any means including, but not limited to, telephone, online accounts, text messages, internet-connected devices, or other electronic technologies. This conduct includes, but is not limited to, coercive control, which is a pattern of behavior that in purpose or effect unreasonably interferes with a person's free will and personal liberty." (*Ibid.*)

Trial courts must make additional findings before issuing mutual domestic violence restraining orders, to "ensure that a mutual order is the product of the careful evaluation of a thorough record and not simply the result of the moving party yielding to the other party's importunities or the court deciding that a mutual order is an expedient response to joint claims of abuse." (*Conness v. Satram* (2004) 122 Cal.App.4th 197, 204.) The trial court is required to "make[] detailed findings of fact indicating that both parties acted as a primary aggressor and that neither party acted primarily in self-defense." (§ 6305, subd. (a)(2).) In making that determination, the court is to consider the provisions concerning dominant aggressors set forth in Penal Code section 836, subdivision (c)(3). (§ 6305, subd. (b).)

Penal Code section 836, subdivision (c)(3) governs the response by peace officers where mutual protective orders are already in place. A warrantless arrest under such circumstances is proper for the person reasonably believed to be the dominant aggressor,

7

i.e., "the person determined to be the most significant, rather than the first, aggressor." (*Ibid*.) A responding officer is required to identify the "dominant aggressor" involved in the incident by considering "(A) the intent of the law to protect victims of domestic violence from continuing abuse, (B) the threats creating fear of physical injury, (C) the history of domestic violence between the persons involved, and (D) whether either person involved acted in self-defense." (*Ibid*.) The same considerations inform whether mutual restraining orders should issue in the first instance. (§ 6305, subd. (b).) In circumstances where there is a dominant aggressor, a mutual order (as opposed to an order restraining only the dominant aggressor) could undermine "the intent of the law to protect victims of domestic violence from continuing abuse." (Pen. Code, § 836, subd. (c)(3).)

We note our disagreement with the view expressed in *K.L. v. R.H*. (2021) 70 Cal.App.5th 965 that the Legislature intended the terms "primary aggressor" and "dominant aggressor" to be used interchangeably. (*Id*. at p. 978, fn. 8.) Family Code section 6305 was amended in 2014 to add current subdivision (b), directing trial courts to "consider the provisions concerning dominant aggressors" in Penal Code section 836 when determining whether "both parties acted primarily as aggressors." (2014 Stats., ch. 635 (Assem. Bill No. 2089, § 6.) Our concern regarding the analysis in *K.L.* is that it appears to be based on an *earlier* version of the bill, which had replaced "primary aggressor" (the original term) with "dominant aggressor" in subdivision (a)(2) (requiring the court to make "detailed findings of fact indicating that both parties acted as a dominant aggressor"); stated that " 'dominant aggressor' has the same meaning as described in [Penal Code section 836, subdivision (c)(3)]"; and proposed a new subdivision (c) stating that "decisional law should apply equally to this section as it refers to 'dominant aggressor' in place of primary aggressor.' " (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2089 (2013-2014 Reg. Sess.) Apr. 22, 2014, p. 6.) The bill which was ultimately passed *rejected* the change to subdivision (a)(2), *rejected* subdivision (c) in its entirety, and adopted the *current* version of subdivision (b). The

same Assembly Committee described the bill in its final form as requiring the trial court "when determining if both parties acted as primary aggressors, to consider the provisions regarding dominant aggressors in the Penal Code, as provided." (*Ibid.*)

## A.    NO STATUTORY DEFICIENCY IN THE TRIAL COURT'S FINDINGS

Li argues the trial court failed to make the required findings of fact regarding self-defense under section 6305, subdivision (a)(2); failed to consider the Penal Code provision regarding "dominant aggressors"; made conflicting "dominant aggressor" findings regarding the Starbucks incident; and provided insufficient detail and analysis for us to assess the factual and legal basis for its decision. We address each argument in turn.

The findings indicate that Li was not acting in self-defense at Starbucks. The court expressly rejected Li's version of events, and credited Yin's testimony that Li pushed her against the door, grabbed her arm, and found Li to be the aggressor. Li asserts that substantial evidence exists to find that he acted primarily in self-defense and for Yin's safety at Starbucks, "even interpreted in the light most favorable to the ruling." Li appears to acknowledge that our review for substantial evidence requires us to consider the whole record in a light most favorable to the judgment. (*Melissa G.*, *supra*, 27 Cal.App.5th 360, 373.) But Li is effectively asking us to reweigh the evidence, which we cannot do. Rather, we resolve all evidentiary conflicts and draw all reasonable inferences in favor of the decision of the trial court, and we accept any reasonable interpretation of the evidence which supports the trial court's decision. (*Id.* at p. 374.) Under that standard, the record supports the finding that Li was not acting in self-defense.

On the issue of primary and dominant aggressors, we understand that the trial court conflated those terms and that Li himself also views the terms as interchangeable. As we have explained, the presence of a dominant aggressor bears on the propriety of issuing mutual restraining orders, because the Domestic Violence Protection Act is intended to protect only victims of domestic abuse. (See Pen. Code, § 836,

9

subd. (c)(3)(A).) The trial court was required to make factual findings indicating that each party acted as a primary aggressor and neither acted primarily in self-defense. (§ 6305, subd. (a)(2).) Although it used the term "dominant" aggressor instead of "primary" aggressor, the trial court found the instances of physical violence were isolated and the relationship was not marked by physical violence. It found Yin was the primary aggressor in the August incident at Li's workplace, and Li was the primary aggressor in the October incident at Starbucks. Those findings indicate that the trial court did not consider either party to be a "dominant" aggressor in the relationship.

We ultimately see no inconsistencies in the court's findings, and we reject Li's contention that the "primary aggressor" finding related to the Starbucks incident does not satisfy the Penal Code "dominant aggressor" factors. Even if the trial court erred by not discussing each Penal Code factor, this record lacks evidence to establish Yin as the dominant aggressor in that incident, and Li therefore cannot show prejudice.

To the extent Li argues that his conduct at Starbucks does not constitute abuse under the Domestic Violence Protection Act, we note the grounds for issuing the restraining order against him were not confined to his conduct on that date. The court also expressed concern with Li's conduct before and after that incident. Li cites *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, which is distinguishable on its facts. There the appellate court found insufficient evidence to support a domestic violence restraining order where the plaintiff verbally "badgered " the defendant during an argument over the defendant's travel plans with the parties' infant son while custody proceedings were pending. (*Id.* at pp. 1265–1266.) Here, Li's conduct was not confined to a heated argument. It was ongoing and at one point manifested in physically aggressive conduct.

As to Li's remaining contention, we find the trial court's analysis more than sufficient to permit review of its decision. The court found that both parties acted as primary physical aggressors at separate times. The court found the incidents of physical abuse testified to were isolated and that physical violence was not otherwise part of the

10

relationship. It found Li's behavior (including his references to the immigration consequences of Yin dating a co-worker, going to Yin's home twice uninvited, the events at Starbucks, and his communications with Yin and her friends following his release from custody) demonstrated a lack of insight and became abusive. The court found credible Yin's testimony regarding the Starbucks incident, and rejected the version of events related by Li. The court found Li's behavior to be controlling and compulsive.

## B. NO ABUSE OF DISCRETION IN THE CONDUCT OF THE TRIAL

Li contends that the trial court abused its discretion by concluding the hearing before receiving all relevant evidence (particularly further testimony from him) and without any warning that he would be constrained by time. He claims prejudice because additional evidence would have clarified events and impeached Yin, resulting in a reasonable probability of a more favorable result.

A trial court is empowered to control the orderly conduct of proceedings before it. (Code Civ. Proc., § 128, subd. (a); *People v. Engram* (2010) 50 Cal.4th 1131, 1146 [trial court has inherent authority to efficiently administer judicial proceedings].) A trial court may exercise discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will consume undue time (Evid. Code, § 352), and may do so on its own initiative to manage proceedings efficiently. (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 19–20.)

The matter here was set on a short cause calendar. (Cal Rules of Court, rule 3.735(a) ["A short cause case is a civil case in which the time estimated for trial by all parties or the court is five hours or less"].) Trial commenced at 9:44 a.m. After spending 30 minutes addressing Li's motions in limine, the court stated its intent to hear the case within four hours, spanning the remainder of that morning and concluding the following Monday. Yin testified for about 75 minutes (45 of which were on cross-

11

examination) and Li testified for 30 minutes. The trial court reminded Li of the time limits when he cross-examined Yin, advised him when his questions were not helpful, and urged him to focus on relevant events.

The second day of trial began at 9:20 a.m. Yin's case concluded at 10:20 a.m. after counsel finished examining Li. Li spent the bulk of his time calling his witnesses, and was repeatedly cautioned when his lines of questioning were not helpful. At 11:19 a.m., the court reminded Li that "we must finish by 12." In the remaining time, the court admitted the deposition testimony of the receptionist who witnessed the August incident at Li's workplace, Li testified on his own behalf, and the court addressed Li's exhibits. The court also briefly elicited from Yin her version of the August incident. Trial concluded at 12:15 p.m., after the court issued its findings and orders.

We see no abuse of discretion on this record. The trial court heard extensively from both parties and considered all evidence it deemed relevant, including Li's testimony that he had received text messages from Yin which he thought were threatening. Li elected to represent himself, and was thus responsible for his own trial strategy. Nor do we see prejudice. Li has not demonstrated the likelihood of a more favorable result had the trial court provided him unfettered time to present his case.

## C. FAILURE TO TIMELY RULE ON LI'S NEW TRIAL MOTION WAS HARMLESS

Li argues the trial court erred by not ruling on his new trial motion, which resulted in the motion being denied by operation of law. The trial court acknowledged that it had misunderstood the scope of emergency orders related to the ongoing pandemic, such that it had no authority to toll the time in which to hear the new trial motion. It apologized for the oversight which it attributed to the extraordinary circumstances, and it explained that the superior court, in any event, simply was not hearing civil motions of this type during the partial shutdown due to COVID-19. Significantly, the court explained in some detail that it would have denied the motion on the merits had it not lost jurisdiction. We

12

therefore find no prejudice resulting from the trial court's failure to issue a timely ruling on the motion.

We have considered and reject Li's remaining challenges to the trial court's findings and credibility determinations. We also deny Li's motion for sanctions. Li's related request for us to order Yin to provide her trial exhibits to Li is denied as moot.

### III.    DISPOSITION

The mutual restraining orders are affirmed. Respondent Yin is awarded costs on appeal by operation of California Rules of Court, rule 8.278(a)(1).

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.



_____

Lie, J.



**H048173 –** *Yin v Li*