Filed 12/8/25  Marriage of Herzog and Kennard CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of KATHERINE HERZOG and JAMES KENNARD. | H052357<br>(Monterey County<br> Super. Ct. No. 19FL001230) |
| KATHERINE HERZOG,<br><br>    Respondent,<br><br>    v.<br><br>JAMES KENNARD,<br><br>    Appellant. | |

In this dissolution of marriage action, James Kennard (father) appeals from the trial court's findings and order granting sole legal and physical custody of father's two minor children to their mother, Katherine Herzog (mother).  After a bench trial, the trial court granted mother's request for sole custody of the children and ordered that father have supervised visits of up to four hours with the children on weekends and video calls of up to one hour twice a week.

Representing himself on appeal, father contends the trial court's decision was in error, resulting from an inconsistently applied burden of proof

and from his former spouse having "instrumentalized the court" to separate him from his children.

While father's contentions reflect his profound frustration with the proceedings in the trial court and the court's rulings, they do not establish error under any principle of appellate review. We therefore affirm the trial court's order.

## I. FACTS AND PROCEDURAL BACKGROUND[1]

### A. *Joint Custody at Divorce*

Father and mother married in 2012 and filed a stipulation for judgment of dissolution in 2021. They have two children, ages 12 and 10 (hereafter, the children).[2]

At the time of their divorce, father and mother lived in the small community of Parkfield in Monterey County. The judgment of dissolution provided for joint legal and joint physical custody of the children and

---

[1] Our summary of the facts and procedural background is drawn from the limited clerk's transcript, consisting of father's responsive declaration to mother's original motion to change the visitation schedule due to changed circumstances, mother's trial brief, and the trial court's findings and order at issue on appeal. We also draw from the augmented clerk's transcript, which contains the stipulation for judgment of dissolution in the case and the relevant requests for order, supporting declarations, and findings and orders of the trial court that preceded the order challenged on appeal. This court previously granted mother's motion to augment the record with these documents and deemed the record augmented. We deny father's recent motion to augment the record with the trial court's May 20, 2024 findings and order after hearing, since the subject findings and order is already included in the appellate record.

[2] To protect the personal privacy interests of the children, we do not use their names. (Cal. Rules of Court, rule 8.90(b)(1).)

implemented a 2/2/3 schedule,[3] with equal sharing of holidays. It also settled other issues, including property division and mother's payment to father of time limited child and spousal support.

*B. Modifications to Custody and Visitation and Move-away Request*

The parties adhered to the shared custody schedule for approximately one year until January 2022, when mother filed a request for order to modify visitation and child support. Mother explained that the modification was needed because father had been evicted from his Parkfield home, had been unable to find suitable housing in or around Parkfield, and was relocating to Morro Bay, requiring a 62-mile drive (taking approximately one hour and 15 minutes) to reach the children's school. Mother expressed concern that "the children would be spending two and [one-]half (2.5) hours to and from school during [f]ather's custodial time," which would have a detrimental impact on their sleep, homework, and extracurricular schedule. Mother proposed modifying the visitation schedule to alternating weekends (from Friday after school to Sunday evening) with a midweek dinner visit and an equal time share, alternating weekly, during summer break.

Father opposed the request to modify custody and visitation and to reduce his child support.[4] Father stated that for the entirety of the marriage, and at mother's direction, he was the primary, stay-at-home parent for the children while mother pursued her art career and traveled regularly. He asserted that her independent wealth and trust income made this

---

[3] The 2/2/3 schedule rotated weekly, where one parent had the children starting on Monday morning through Wednesday morning, the other parent from Wednesday morning to Friday morning, and back to the first parent Friday morning through Monday morning.

[4] Because child support is not at issue on appeal, we focus only on the relevant factual and procedural history pertaining to custody and visitation.

arrangement possible.  Shortly after the entry of judgment in the dissolution, father's landlord informed him of a significant rent increase (which father asserted was illegal) and additional charges for keeping horses on the property.  The landlord ultimately served him with a notice of eviction. Father believed that mother orchestrated the eviction to force him out of Parkfield, knowing he would not be able to find alternative housing, given the limited housing options in the area and his lack of credit and employment opportunities.  After a diligent search expanding outward from Parkfield, father secured a two-bedroom trailer at a mobile home park in Morro Bay.

Father stated that Parkfield's remote location meant he and mother regularly drove significant lengths with the children, such as to Paso Robles for groceries and for their weekly dance classes, or to San Luis Obispo for the climbing gym and other activities.  He asserted that mother "did not have a problem with the drive time" before the divorce and indicated it was mother's "unilateral decision" to remain in Parkfield after their separation.  Father requested that instead of modifying visitation, the trial court issue an order for the children to "reside primarily" in Morro Bay and attend elementary school there, with a shared parenting schedule during summer break.  In support of his proposal, father argued that mother's requested modification would be distressing to the children, who had gone from having him as their primary parent to a shared 2/2/3 schedule to the possibility of being effectively removed from him "due to the impossibility" of him finding housing and employment in Parkfield.  Father also raised other concerns in his declaration about mother's parenting and stated that he had recently obtained employment developing and implementing a children's program at a climbing gym in San Luis Obispo and as a bike courier.

After a hearing in March 2022, the trial court referred the parties to a child custody evaluation (hereafter, custody evaluation) pursuant to Evidence Code section 730 and Family Code section 3111.[5]  The court construed father's responsive declaration as a move-away request and defined the scope of the custody evaluation to "include father's request for a move-away, child custody [and] visitation, a parenting plan, and choice of school."  The court also referred the parties to "[c]hild [c]ustody [r]ecommending [c]ounseling" (hereafter, counseling session), issued a modified visitation schedule, and made other orders related to child support and financial issues.

In May 2022, mother provided the trial court with an "updating" (capitalization & boldface omitted) declaration following the counseling session.  Mother stated that she and father attended separate sessions at father's request, based on his assertion that she "exercise[s] 'coercive control over him.' "  Mother denied having ever exercised such control over father or committing any form of domestic violence.  She explained that she and father were unable to agree on a permanent schedule for the children but did agree on one issue related to phone calls during each parent's noncustodial time.  Mother asserted that since father's move to Morro Bay, he had not supported the children's participation in events at their school which was "having a negative impact" on them during the school year.  She also raised the issue of

_____

[5] Family Code section 3111, subdivision (a) authorizes appointment of a child custody evaluator in contested proceedings involving custody or visitation rights where the court determines it is in the best interest of the child.  The custody evaluation must be conducted in accordance with specified standards adopted by the Judicial Council and may include the filing of a written confidential report.  (*Ibid.*)  The confidential report "may be received in evidence on stipulation of all interested parties and is competent evidence as to all matters contained in the report."  (*Id.*, subd. (c).)  Evidence Code section 730 governs the appointment of an expert by the trial court.

the children's hygiene, which she contended suffered while they were in their father's care.

In an order issued after a May 2022 hearing, the trial court clarified aspects of the visitation schedule, which the parties agreed for the summer would consist of alternating weeks. The court ordered two telephone calls weekly for the noncustodial parent during their off week, set a continued hearing to review the custody evaluation, and ordered mother to pay attorney fees to father in the amount of $5,000.

*C. Child Custody Evaluation and Temporary Orders*

Dr. Regina Marshall, appointed by the trial court as a custody evaluator, began her evaluation in July 2022. Dr. Marshall submitted her confidential report to the court on February 9, 2023.[6]

On February 16, 2023, mother requested and obtained temporary emergency orders based on information in the completed custody evaluation. Mother asked the trial court to grant temporary sole legal and physical custody to her and order that father have professional supervised visitation with the children pending a hearing. Mother stated that upon reviewing Dr. Marshall's report, she became "deeply concerned with [f]ather's ability to adequately care for our children during his parenting time." Mother did not discuss the contents of the custody evaluation but noted Dr. Marshall's recommendations, including that father have supervised visitation with the children, that mother have sole decisionmaking authority, and that father not participate in or attend school functions.

After a hearing on March 3, 2023, in which father was represented by counsel, the trial court granted mother—temporarily and without prejudice—

---

[6] As described *post* (pt. I.D.), although Dr. Marshall testified at the bench trial, the custody evaluation report was not admitted into evidence.

sole legal and physical custody of the children. The findings and order after hearing specified that father would have supervised visitation with the children every Monday afternoon for two hours in Paso Robles, with both parties to share the costs of the professional supervisor, and a video call with them every Friday evening for one-half hour. The court ordered father to temporarily not attend the children's extracurricular or school activities and to begin seeing a licensed marriage and family therapist or licensed clinical social worker, who would update both counsel on father's progress.

Prior to the continued hearing, mother filed an "updating declaration" (capitalization & boldface omitted). She reported that according to the supervisor's report, the visits were going well. She noted various challenges to communicating with father through the designated communication software and stated that counsel had not received any progress report from father's therapist. Mother requested continued supervised visitation until father could make progress on his mental health and improve his communication with her.

At the hearing on June 9, 2023, the trial court extended the temporary supervised visitation order but permitted the parties to split father's supervised visit time between two days and increase it up to four hours per week, subject to the professional supervisor's availability. Father asserted in a subsequent declaration filed in July 2023 that the "wrong parent is under supervision" and that mother's "[m]anipulative and controlling behavior" and "industrialized gaslighting" were traumatizing him and the children and putting him in "financial peril." Father described the stress caused by mother's tactics, which he asserted had forced him to step down from his position at the climbing gym, causing "[m]ore loss" for him and the children, her attempts to isolate him from his family, and her hypocritical stance on

7

the children's safety and well-being. Father also challenged the validity of the custody evaluation report, stating it was "contradictory, incoherent and anything but forensic." The trial court made no changes to the temporary custody and visitation orders at the next hearing on August 4, 2023, but ordered a report from the visitation supervisor to be submitted to the court.

*D. Bench Trial on Requests for Orders on Custody and Visitation*

On March 28 and 29, 2024, the trial court held a bench trial on the validity of the child custody evaluation, the temporary orders that came out of that evaluation, and the status of father's therapy. Mother was represented by counsel at the bench trial; father represented himself.

Both sides presented opening statements and called witnesses, including Dr. Marshall and the professional supervisor who supervised father's visitation with the children. Mother and father each testified. We describe the testimony and evidence in more detail as relevant to our analysis, *post*.

Regarding the custody evaluation report, father objected to its admission into evidence on grounds that the report is "incomplete, the supporting evidence isn't there[,] and no one's made sworn statements. They could all be lying." After hearing argument, the trial court declined to admit the report but stated it would consider Dr. Marshall's testimony in issuing its decision. The court explained that "there are various hearsay objections that likely would allow for the admission of various statements that might otherwise be considered hearsay that were testified to by Dr. Marshall" and that it would consider Dr. Marshall's testimony "as an expert witness who is . . . qualified to render opinions under [Family Code section] 3111 enabled by Evidence Code section 730 as an expert in child-custody evaluations."

After closing arguments, the trial court orally recited its findings. It found that Dr. Marshall was qualified to render her opinion and assist the court in deciding on a plan for child custody and visitation. It found that father participated in therapy "to deal with the fallout of losing his family" but did not "address the issues" identified by Dr. Marshall in her report. The court also found that while supervised visits initially occurred, the visits had become more fleeting, and the children reported to their mother that visits were not happening because their father could not afford them. When mother attempted to contact father to offer to pay for alternating visits to ensure continuity, he did not respond to her.

Based on these and other facts, the trial court found that father had not addressed any of the mental health issues identified in Dr. Marshall's recommendations and that his reality, as testified to by father himself, " 'is different than [mother's reality].' " The court found that while father genuinely believed that both the community of Parkfield and the court system were against him, "[t]hat is the insidious nature of mental illness." The court referred father to available mental health services and stated it was important for him to address those issues for himself and for the children.

After reciting the factors and evidence under consideration, the trial court made permanent, as a final judgment, the order granting mother sole physical and legal custody of the children with weekly supervised visits for father and the children of up to four hours on weekends and video calls of up to one hour twice a week. The court directed mother's counsel to prepare the written findings and order for submission within 60 days.

*E. Final Custody and Visitation Orders*

On May 20, 2024, the trial court issued its findings and order after hearing (order). The court stated the order was a final judgment under *Montenegro v. Diaz* (2001) 26 Cal.4th 249 (*Montenegro*),[7] ordered sole physical and legal custody of the children to mother, granted father supervised visits of up to four hours on weekends, the cost to be shared equally between the parties, and twice-weekly video calls of up to one hour for father and the children. The court referred father to mental health services but did not order his participation.

Among the findings and factors cited by the trial court, it found that father had not addressed the mental health issues cited in Dr. Marshall's recommendations, continued to believe that the community and the system were against him, and that while he is healthy, articulate, and likeable, his mental health or cognitive issues have contributed to an inability to support himself financially and provide a stable environment for the children. The court found that while mother has access to money and father does not, there was insufficient evidence of alleged coercive control or abuse by mother. It found there were safety concerns noted by Dr. Marshall (though vigorously contested by father) with respect to father's supervision of the children. The court found certain factors were neutral, including the children's love for both parents, with no evidence of preference between parents and no evidence of addiction or substance misuse by either parent.

Regarding the degree of conflict between the parents, their ability to coparent, and their ability to communicate effectively and put the children's

---

[7] In *Montenegro*, our Supreme Court articulated factors for deciding what standard applies to modified child custody determinations that depend on whether the earlier, stipulated custody order was intended to be a final custody determination. (*Montenegro, supra,* 26 Cal.4th at pp. 258–259.)

interests first, the trial court found that the level of conflict was high, that father had an inability to coparent or communicate with mother, that he acted against anyone perceived to be against him, resulting in strained communications with the children's teacher, and that he was unable to resolve conflicts that arose in various settings. The court found these factors weighed heavily in favor of mother.

The trial court also considered factors relevant to father's move-away request, citing *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*). The court found that relocating the children from their school and residence in Parkfield to Morro Bay would cause "severe disruption" to their established patterns of care and emotional bonds, considering the one and one-half hour, one-way driving time, the children's current enrollment in Parkfield's school, and the custodial arrangement with the children who had lived primarily and continuously with mother since 2023.

Father timely appealed from the custody and visitation order.

## II. DISCUSSION

In his opening brief, father attacks the trial court's order on numerous grounds. He asserts, inter alia, that "[t]he burden of proof is inconsistent, where the petitioner has no obligation to prove any of her or her collaterals [*sic*] claims," that "[a] coercive and controlling individual with non requirement [*sic*] to prove their allegations would be able to instrumentalize the court to the detriment of their victim" as "has transpired in this case," that he "[wa]s required to disprove the claims of the petitioner and her collaterals" and was unable to present his rebuttal evidence to the court due to the court "limiting the duration of the trial," and that the outcome of the trial is based on "[d]iscrimination" and "[h]ostile prejudice." In his reply brief, father expands on this list of grievances, providing an extensive

11

narration of his disagreement with the court's rulings and accusations against mother and the family court system.

As we explain, the rules of appellate review require the appellant—here, father—to demonstrate error based on the record, reasoned argument, and applicable legal authority. Father's briefing fails to satisfy these criteria. We nevertheless address his arguments as set forth below, beginning with the principles and standards that govern our review of the appeal.

*A. Principles of Appellate Review*

The general rule of appellate review is that a reviewing court examines the correctness of a judgment or order based on a record of those matters that were before the trial court. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1102) ["[A]ppellate courts review a trial court's judgment based on the record as it existed when the trial court ruled."].) The appellate court will only consider matters that were part of the record before the trial court and will disregard statements of fact or factual assertions that are not supported by reference to the trial court record. (*McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 947.) Father, although self-represented, must follow these rules. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247.)

Appellate courts are also required, under the principles of appellate review, to presume the trial court's order was correct. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 (*Jameson*).) To be successful on appeal, father, as the appellant, must show reversible error based on the trial record that he has provided to this court. (*Id.* at p. 609; *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.) In addition, the appellant must support his contentions with reasoned argument and relevant legal authority. (*Falcone*

*& Fyke* at p. 830; *In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1164.) Relying on purely conclusory assertions of error may forfeit the argument on appeal. " 'The absence of cogent legal argument or citation to authority allows this court to treat the contentions as' forfeited." (*In re Marriage of Carlisle* (2021) 60 Cal.App.5th 244, 255 (*Carlisle*); see also *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited]."].)

Applying these principles, we observe that the designation of record on appeal was limited to father's declaration in response to mother's 2022 request to modify custody and visitation and to reduce child support and omitted all of mother's declarations and briefing, apart from her trial brief. Further, while mother's motion to augment the appellate record provided additional material to facilitate this court's review and consideration of the issues father has raised, father's briefing is devoid of record or legal citations. He makes conclusory assertions of error (e.g., that he "is found to be at fault when he is not" and that the findings against him stem from "hostile prejudice") unaccompanied by reasoned argument or legal authority.

The designation of an inadequate record on appeal and failure to cite to the record for factual propositions or support arguments with legal authorities allows this court to treat father's arguments as forfeited. (*Carlisle*, *supra*, 60 Cal.App.5th at p. 255.) Nevertheless, given the importance of these proceedings to the parties and their children, we elect not to treat father's contentions as forfeited. While we do not develop his arguments for him (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor

13

to make arguments for parties."]), we do attempt to discern and address father's contentions of error as set forth in his briefing and further clarified at oral argument.

Father asserts that the trial court failed to evenly apply the burden of proof, treating mother's claims "as fact" and requiring father to rebut or disprove "these unproven claims." Father further asserts that the court limited his ability to present his evidence and lacked the resources to hear that evidence. Father also challenges the evidence cited by the trial court in its custody and visitation order as contradictory and false. We distill these arguments into three contentions on appeal: whether (1) the trial court misapplied the burdens of proof and failed to require mother to prove her allegations, (2) unfairly curtailed father's ability to present his case and/or evidence, and (3) entered a final custody and visitation determination which is not supported by valid facts or evidence.

*B. Burden of Proof at Trial*

"Evidence Code section 500 provides, 'Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting.' Under Evidence Code section 500, the plaintiff normally bears the burden of proof to establish the elements of his or her cause of action." (*Cassady v. Morgan, Lewis & Bockius LLP* (2006) 145 Cal.App.4th 220, 234, citing *Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1668.) While there are instances in which courts have shifted the normal allocation of the burden of proof, "the exceptions to Evidence Code section 500 are 'few, and narrow' [citation] and the normal allocation of proof has been altered only on 'rare occasions.' " (*Cassady*, at p. 234.)

14

Father contends the trial court applied an "inconsistent" burden of proof, where mother had "no obligation to prove any of" her claims, and he was "required to disprove the claims of [mother] and her collaterals." To the extent that father challenges the trial court's application of Evidence Code section 500, we review de novo the application of a statute to the circumstances present. (*In re Marriage of Thornton* (2002) 95 Cal.App.4th 251, 253–254.)

Father's contention that mother was not required to prove her claims is not supported by the record. The parties agreed at the outset of the bench trial that the issues for decision were the validity of the custody evaluation report and its recommendation, the temporary custody and visitation orders derived from the evaluation, and the status of father's therapy. Mother asked the trial court to not modify the temporary orders and adopt Dr. Marshall's recommendations in full. Father, by contrast, objected to the adoption of the evaluation recommendations and asked the court to remove supervised visitation. Based on his prior declaration and updating declaration to the court, father had also requested a change of custody to allow the children to live with him after his move.

The parties' burdens at trial accorded with each side's claims and defenses. (See Evid. Code, § 500.) Mother bore the burden at trial to establish the validity of the custody evaluation and its recommendations, consistent with the best interest of the child standard applicable to custody and visitation determinations. (See Fam. Code, §§ 3011, 3020, 3040, subd. (e); see also *Montenegro, supra,* 26 Cal.4th at p. 255 [reiterating best interest of the child as the standard governing child custody and visitation].) Mother adduced testimony to this effect, presenting both Dr. Marshall's

qualifications and opinion testimony and testifying on her own behalf about the challenges she encountered trying to coparent with father.

The trial court ultimately rendered a decision under *Montenegro*. Father's disagreement with the court's weighing of the evidence, credibility determinations, and findings does not equate to an improper shifting of the burden of proof from mother to father on the issue of the custody evaluation and resulting recommendations. Although father characterizes his burden to cross-examine Dr. Marshall, challenge the basis for her conclusions and recommendations, and counter mother's showing, as an improper shifting of the burden of proof, he cites nothing in the trial record that would support this claim.

Furthermore, to the extent that father sought to shift the children's primary residence to Morro Bay—as asserted in his declaration opposing mother's initial request to modify custody and visitation (the only declaration he included in the record on appeal)—the trial court properly considered factors relevant to relocation and move-aways as articulated in *LaMusga*. In *LaMusga*, the California Supreme Court reinforced its prior holding that in a move-away situation, the trial court exercises " 'broad discretion to determine, in light of *all* the circumstances, what custody arrangement serves the "best interest" of minor children' " (*LaMusga, supra*, 32 Cal.4th at p. 1088) and rejected any additional burden of persuasion on the parent seeking relocation to prove the move is " 'necessary' " (*ibid*.). Factors relevant to a proposal to change the children's residence include: "the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness

16

to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*Id.* at p. 1101.)

There is no indication in the record that the trial court shifted to father the burden of invalidating the opinion and recommendations of the custody evaluator or erroneously required father to demonstrate that relocation was necessary. (Cf. *LaMusga, supra,* 32 Cal.4th at p. 1098.) Instead, the court properly considered and weighed the evidence on both sides regarding the custody and visitation arrangement under the *LaMusga* factors and the best interest of the child standard. We reject father's assertion that in so doing, the court applied an inconsistent or erroneous burden of proof.

*C. Trial Management*

Father contends that the trial court did not hear his evidence due to "not having the resources to hear it and limiting the duration of the trial." However, father does not specify what evidence he sought (but was unable) to present, nor does he address how presenting such additional evidence would have affected the court's findings and order.[8]

In California, "[a] trial court has the inherent authority and responsibility to fairly and efficiently administer the judicial proceedings before it." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 22 (*California Crane*).) A trial court's "inherent power to control litigation before [it]" (*Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1377) includes "broad authority over the

---

[8] At oral argument, father represented that he had been unable to present numerous documents at trial that would have disproven or proven baseless certain statements in the custody evaluation.

17

admission of evidence" (*id.* at p. 1379) and "the power to expedite proceedings" (*California Crane*, at p. 22) or restrict the length of witness testimony, where further testimony would not significantly aid the trier of fact. (*Id.* at pp. 20, 22.) Nevertheless, a court's broad discretion to manage the litigation may not deprive a party of a fair trial by denying the right of a party to testify or offer evidence. (*Id.* at pp. 22–23.)

Our independent review of the record reveals no abuse of discretion in the trial court's administration of the trial. Father points to the court's statement emphasizing that the trial had to be finished by the end of the day. However, the court directed this statement at both parties in the context of reminding mother's counsel to "be a little strategic" in his questioning given "the limited time" left that day and to ensure father would have sufficient time for his cross-examination. Thus, this statement did not preclude father from presenting witnesses or testimony, nor limit his time for cross-examination.

Moreover, the trial court's indication that trial would be completed by the end of the day was consistent with the parties' time estimates for each witness at the outset of the trial. When asked for his time estimates, father provided his anticipated time for cross-examination of Dr. Marshall and mother. For his percipient witnesses, father estimated the time required for each, including the visitation supervisor, his neighbor in Morro Bay, and his former coworker at the climbing gym. Father told the court that he was not calling as a witness the therapist who had been treating him and did not indicate any other witnesses he wished to call. Furthermore, at the close of evidence, the trial court allowed the parties to return and present closing arguments the following day so that neither side's argument would be interrupted. At no point in the trial record did father seek to introduce

18

additional witnesses, object to the one-day trial, or indicate that the court had unduly constricted his questioning of witnesses or presentation of evidence.

In sum, the record shows the trial court reasonably limited the length of witness questioning to enable both sides to adduce evidence within the estimated time of trial. We conclude that administration of the trial was evenhanded and within the court's broad authority to control and manage the proceedings efficiently. (*California Crane*, *supra*, 226 Cal.App.4th at p. 22.) Father has not shown that the court's actions unduly restricted his ability to present his case.

### D. Substantial Evidence

Father variously asserts that mother prevailed without proving her claims, that the trial court referred to certain evidence as uncontroverted even though father challenged that evidence at trial, that the custody evaluator's methodology was flawed and her evidence unreliable, and that father was unfairly subject to contradictory, false, and misleading claims based on hostile prejudice against him. These contentions essentially challenge the sufficiency of the evidence underlying the trial court's findings and order.

#### 1. Standard of Review

"We review the trial court's factfinding for substantial evidence. This traditional standard of review is highly deferential. It has three pillars. First, we accept all evidence supporting the trial court's order. Second, we completely disregard contrary evidence. Third, we draw all reasonable inferences to affirm the trial court. These three pillars support the lintel: we do not reweigh the evidence. [Citation.] Under this standard of review,

19

parties challenging a trial court's factfinding bear an 'enormous burden.' " (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*).)

In other words, "[w]hen a civil appeal challenges findings of fact, the appellate court's power begins and ends with a determination of whether there is any substantial evidence—contradicted or uncontradicted—to support the trial court findings." (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582.) " ' "Substantial evidence" is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value.' " (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246 (*Pope*).) For purposes of substantial evidence review, it is of "no consequence" that inferences favorable to the appellant's position may create a conflict in the evidence, nor whether substantial evidence in the record might have supported a different determination. (*Schmidt*, at p. 582.) A reviewing court will not disturb the factual findings of the trial court if supported by substantial evidence. (*Ibid*.) Moreover, "in a bench trial, the trial court is the 'sole judge' of witness credibility. [Citation.] . . . The fact finder's determination of the veracity of a witness is final. [Citation.] Credibility determinations thus are subject to extremely deferential review." (*Ibid*.) The appellate court is " 'not a second trier of fact' " (*Pope*, at p. 1246), and the "party 'raising a claim of insufficiency of the evidence assumes a "daunting burden." ' " (*Ibid*.)

### 2. Additional Background

At the bench trial, mother's counsel emphasized the best interest of the child standard under Family Code section 3011 and argued that the evidence supported implementing the recommendation of the custody evaluation. Mother's witnesses included Dr. Marshall and mother herself. Father, representing himself, sought the termination of supervised visitation and shared custody with mother. He questioned how "a full-time father, who is a

parent for ten years, who . . . raised the children, suddenly became incapable of looking after them when scrutinized through the lens of [mother] and [mother]'s collaterals."

### a. Mother's Witnesses

Mother called Dr. Marshall who testified as an expert in child custody and visitation. Father did not object to the trial court deeming Dr. Marshall an expert in child custody evaluations and making recommendations to the court under Family Code section 3111 and Evidence Code section 730.

Dr. Marshall testified regarding her extensive experience as a clinical psychologist and custody evaluator, the scope of her evaluation in this case based on the trial court's order, and the steps taken in preparing the custody evaluation report. Dr. Marshall testified in detail about her interviews with both parents and what she observed about their perceptions of themselves and each other, their parenting strengths, and any challenges or concerns. She reported on the results of the psychological testing she had conducted with each parent and on her "collateral interviews" with other individuals connected to the family, including neighbors, the children's teacher, and father's former landlord.

As to father, Dr. Marshall concluded that he has "both cognitive and emotional challenges and difficulties that interfere negatively and impact his relationship with others, which then, in turn . . . negatively impact his ability to function and operate in the world." Dr. Marshall noted several examples, including "difficulty in co-parenting, difficulty with interacting with the school, his difficulty interacting with his landlord and other community members." She opined that father's "psychological difficulties interfere with his work, his relationships, and ability to manage his life, which then impact his choices that he makes for his children."

21

Dr. Marshall provided examples from her interviews with father's former landlord and the children's teacher, which she stated described conduct consistent with her psychological testing and interviews with him. She opined that father's conflict with the landlord after the landlord attempted to increase father's rent showed father's tendency to "completely flip[]" from having a good relationship to one turned sour, as soon as father perceives any adversity. Similarly, Dr. Marshall testified that the children's teacher reported becoming afraid of father after challenging interactions and communications, such as when the teacher could not get father to leave a parent-teacher conference after the conversation had "turned negative and circular," causing the teacher to leave the room and hide in a closet until father had gone.

Dr. Marshall did not find evidence to support father's allegation of coercive, controlling behavior by mother or of intimate partner violence. Dr. Marshall opined that because of father's consistent refusal to take "any responsibility for any of his part in any of the conflict[s]," he did not have the necessary coping skills and life management skills to create a stable and secure home. She pointed out that even after a four-year period since his separation from mother, father had been unable to find stable employment that would allow him to support himself and had made decisions that undermined his stability. She gave the example of father sitting outside the children's school in his truck between drop-off and dismissal on his custodial days because he could not afford the gas for his truck, which then prevented him from being able to obtain work during that time, contributing to his financial instability.

Based on these factors and father's conflicts with others, Dr. Marshall recommended interventions, including a neuropsychological evaluation to

22

help father improve executive functioning to manage his daily affairs and parenting classes or coaching to help him plan and engage in age-appropriate activities with the children. She did not recommend coparenting counseling due to father's inability or unwillingness to work mutually with mother. She further recommended that mother be the "primary resident parent," with sole physical custody and decisionmaking authority to allow her to work collaboratively with the children's teachers and healthcare providers without experiencing constant conflict with father. Dr. Marshall provided other recommendations regarding therapy and the use of a parenting coach or supervisor to try to facilitate father's ability to "have a pathway back to his children and to participate in their life again."

In his cross-examination of Dr. Marshall, father disputed the accuracy of the information she had received from others in Parkfield and her testing methodology. Dr. Marshall agreed that it was possible the collateral individuals could have been dishonest and she did not "know [if] what the collaterals told [her] is true." Dr. Marshall also did not know certain details about the narratives she had related, including which horse was being ridden by father's older child when she fell and got a concussion, or on which beach he purportedly allowed the children to play unsupervised (according to one of her interviews). Dr. Marshall acknowledged that in a custody evaluation, the collaterals of one party do not always tell the truth about the opposing party and responded "True" to the follow-up question, "So the data could all be nonsense?" On redirect by mother's counsel, Dr. Marshall testified that it is the judge who decides credibility, and as an evaluator her role is to decide the validity of the information provided to her based on the responses and other corroborating information.

Mother testified regarding the emergency orders for custody and visitation beginning in February or March 2023, her efforts during her marriage with father to encourage him to seek therapy for his mental health and to seek marital therapy together, and her concerns after their separation about the children when in his care and commuting from Morro Bay for school. She testified that since December 2023, father had only three visits with the children, at which point she had offered to pay for every other week's visits because she thought it would benefit the children to have a reliable schedule to see their father. However, father did not respond to her offer. As of the trial, mother did not feel it was possible to coparent with father but hoped that they would at some point be able to have meaningful conversations about the children and coparent together. She asked the trial court to deny father's move-away request.

b. Father's Witnesses

Father testified on his own behalf and called several witnesses who testified regarding his character as a parent.

Shalom Johnson, father's neighbor at the mobile home park in Morro Bay, testified that as the father of a young child, he is "always in the business of looking for good parents" to spend time with who are like minded and responsible. Johnson views father as "one of the more responsible parents that" he knows and described father as very attentive to detail when it comes to safety. Johnson and his child spent several hours every weekend with father and the children when they visited father regularly, before visitation changed.

Katherine Sequeira, who manages a horse boarding facility where father boards his horse, testified that she has observed father and the children at the facility over the past two years. Sequeira rated father's skills

with horses as "above average" and stated that she would trust him with any horse at the barn. She observed that when father was with his children at the barn, he always put the children first, spoke highly of them, had fun with them, and was "a really good father."

Rachel Russell was the manager of coaching and programs at the climbing gym where father previously worked. Father "was head of his own rec program, the nurture program" where families with young children climbed together, bonded, and learned motor skills. Russell testified that she "learned a ton" from father about working with young children and their parents at the climbing wall. Russell also got to know father's children, who would accompany him to the Saturday nurture program and help to set up and run activities. She observed the children were very engaged and excited to be helping father and interacting together.

Father also called the visitation supervisor, Leah Minnery. Minnery testified that she had supervised visits between father and the children for approximately the past year, since February 2023. In her reports to the trial court, Minnery had not identified any concerns or problems with the visits. She found the interactions between father and the children to be "very appropriate, playful, engaging." Minnery agreed on cross-examination that she was not qualified to make recommendations regarding custody and visitation.

Father testified about his interactions with mother and certain incidents involving the children. Father denied that he had failed to effectively communicate with mother, denied that the alleged incidents were as described by Dr. Marshall (such as that he withheld medication from his daughter after she fractured her wrist, or that he made inappropriate comments to the children during Dr. Marshall's observation and interview),

25

and denied any responsibility for the present conflict. Father testified to his version of events cited in Dr. Marshall's testimony, including the parent-teacher conference with the children's teacher, the rent increase that led to father's eviction from his home in Parkfield, and father's experience with horses and teaching the children riding. He asserted that the criticisms against him were unjustified, stating that just because collateral witnesses made statements to Dr. Marshall "doesn't make [them] true." Father suggested that no matter what position he took in his attempts to respond to criticism, he was cast in a negative light. For example, he stated "if you're being constantly attacked, it's hard to cope. And then being told you're not able to cope . . . it's just another attack." Father also asserted that the collateral witnesses interviewed by Dr. Marshall were all beholden to mother, either due to economic circumstance and dependence on mother for employment, or because she owned land in Parkfield.

Father testified that having the children taken from him after having been their full-time caregiver—effectively being told "you're a useless idiot and you can't even look after your children"—was "incredibly painful." In response to the trial court's inquiries about therapy, father testified that he had attended therapy, as directed by the court, weekly for about three months and "the therapist was very helpful and kind." However, father stated that he "can't change what [he's] not doing, and [he] can't change what's in people's imagination." His focus in therapy was "coping with . . . the fallout from the [custody evaluation] report and trying to understand how it happened and how to survive it." Father had no plans to restart therapy in relation to the custody evaluation because he did not agree with the evaluator's recommendations and explained that he had started a sheepskin business that was "very demanding" of his time and energy.

Father also testified regarding mother's coercive control over him during their marriage and over his agreement to the divorce settlement. He asserted that Dr. Marshall misinterpreted what "should be seen as a trauma response" to mother as a perceived inability on his part to cope or communicate. He maintained that Dr. Marshall continued to assume in each instance that he had done something wrong rather than recognize mother's crossing of the personal boundary he was attempting to set so he could feel safe.

### 3. Analysis

Father contends that the trial court ignored his evidence and credited assertions and claims that were unproven and contradictory. We agree that the record shows father disputed the veracity of mother's testimony, questioned the reliability of the collateral witnesses interviewed by Dr. Marshall, and attempted to prove that the recommendations of Dr. Marshall were unfounded. Father also presented evidence of his positive parenting abilities as reflected by his years being the primary caretaker of the children, the testimony of the visitation supervisor, and as testified to by witnesses who observed him engaging with his children and leading the nurture program at the climbing gym. However, for purposes of substantial evidence review, father's efforts to undermine the validity of Dr. Marshall's findings by introducing evidence favorable to himself and discrediting the reliability of Dr. Marshall's collateral sources (at least insofar as Dr. Marshall admitted that collateral interviewees could be failing to tell the truth), does not diminish the existence of evidence that is reasonable and of solid value supporting the custody evaluation report recommendations. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582; *Pope*, *supra*, 229 Cal.App.4th at p. 1246.)

For example, father asserts that on cross-examination, Dr. Marshall admitted that the data utilized in her custody evaluation "could all be nonsense." Father adduced this testimony in the context of asking Dr. Marshall whether collateral witnesses sometimes lied in custody proceedings, which she conceded did occur. On redirect, Dr. Marshall further testified that her role as an evaluator is not to assess witness credibility but to decide whether the information she has obtained is valid and useful for purposes of the custody evaluation—an assessment she makes by comparing and evaluating various sources of information.

Father would infer from this testimony that Dr. Marshall's report is invalid because her collateral sources were not trustworthy. However, this is not the only reasonable inference. The trial court found that Dr. Marshall "was qualified to render her opinion regarding child custody and visitation, child custody evaluations under [section] 3111 of the Family Code, . . ., [and] to assist the court and the parties in coming up with a plan after her investigation, which included home visits, . . . interviews of the parents, . . . interviews of the children[,] . . . [and] interviews of multiple individuals in the community, as well as, an individual outside of the community, a person known to [father] in Los Angeles before they moved [to Parkfield]." Drawing all reasonable inferences in favor of the trial court's findings (*Schmidt, supra*, 44 Cal.App.5th at pp. 581–582), we conclude that, based on its findings concerning Dr. Marshall's qualifications and her sources of information, the court implicitly found that in her capacity as an expert in conducting custody evaluations, Dr. Marshall used multiple toolsets and sources of information to derive her opinions and conclusions and to ascertain whether the information provided by collateral witnesses was valid for inclusion in her report.

These implied findings are supported by the trial record. Dr. Marshall testified about her observations with respect to collateral witness testimony and how she assessed the information obtained from them. She explained that she found mother's input about coparenting with father and the information obtained from mother to be valid because mother's statements were "consistent with" her behavior in her interviews with Dr. Marshall "and consistent with the information and facts that [she] received from others."

By contrast, Dr. Marshall testified that she "did not find that what [father] verbalized to [her] was consistent with his behavior. [She] did not find that collaterals or outside information corroborated his information or facts. In fact, it typically was just the opposite." Because substantial evidence in the record supports the validity inference adopted by the trial court in its findings, we defer to the court's determination of the facts. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582.)

Father contends that even though the custody evaluation report was not admitted into evidence, the trial court erred by referring to "an allegation" in the report as a factor in the court's determination. Father points to the court's oral pronouncement summarizing its findings—quoted without citation in father's brief—in which the court referred to testimony regarding safety concerns related to the children being left near a water source unattended and to their experience and supervision around the horses. Father also appears to challenge Dr. Marshall's testimony insofar as she was permitted to testify regarding her opinions and the information and interviews that she considered.

Father does not articulate any basis for reversal of the trial court's decision on these points. Father maintains that the evidence about the water source was controverted, because he challenged the hearsay nature of the

29

information that Dr. Marshall obtained from the children's teacher regarding them being left unsupervised at the beach. However, it appears that the court in its oral recitation was referring to a different portion of testimony in which Dr. Marshall related concerns raised by father's former neighbor in Parkfield about the children walking to the river by themselves. Father did not object to this testimony, nor did he seek to rebut it in his own testimony, forfeiting this argument on appeal. (*People v. Blacksher* (2011) 52 Cal.4th 769, 825.)

Moreover, even if the trial court erroneously failed to note the controverted nature of the testimony regarding the children's safety when in father's care, father has not demonstrated prejudice. Given the range of admissible testimony provided by Dr. Marshall—including based on her extensive psychological testing of the parties and interviews with the parties and the children—Dr. Marshall's testimony about certain hearsay sources of information was limited and mostly corroborative of information she reported directly. It is appellant's burden to demonstrate that the trial court committed more than harmless error, justifying reversal of the judgment. (*Jameson*, *supra*, 5 Cal.5th at p. 609.) That the record also contains evidence that would support inferences favorable to father's position does not demonstrate a lack of substantial evidence to support the trial court's decision. (*Schmidt*, *supra*, 44 Cal.App.5th at p. 582.)

The trial court clearly stated in its findings that while safety issues were raised and "weigh[] slightly towards [m]other," the court's "main concern" was "stability for the children." Having carefully reviewed the entire record, substantial evidence supports the court's determination that for purposes of stability and continuity of care, it is in the children's best interest to remain with mother as the custodial parent. The evidence

30

supporting this determination includes, inter alia, Dr. Marshall's unchallenged qualifications as an expert in custody assessments, father's challenges coparenting with mother, his difficulty responding to any perceived conflict with or adverse treatment by individuals like the children's teacher or members of the Parkfield community, his struggle to achieve stability in employment and housing and pattern of blaming others for his trouble, and his failure to address therapeutically any of the issues raised in the custody evaluation report. These factors, considered together with the children's attendance at school in Parkfield, length of the drive to commute to and from Parkfield, and lack of evidence supporting father's claims of coercive control and manipulation against mother, support the trial court's findings.

We recognize that father perceives these findings to be based on contradictory, biased, and discriminatory information directed unfairly against him, despite his longtime and successful role as the children's primary caregiver. Father's assertions of hostile prejudice and differential standards of treatment by the trial court reflect his frustration with the circumstances that gave rise to the court's initial, emergency and temporary orders modifying the agreed-upon custody arrangement and his belief that he is the victim of a coordinated attack by mother and those in the Parkfield community to ostracize him and deny him shared custody and unsupervised visitation with the children. We agree with father that the record shows he is a loving parent who has experience working with children. However, because substantial evidence supports the trial court's findings and we may not second-guess on appeal the trial court's credibility determinations, we conclude that father has not shown reversible error.

31

## III.   DISPOSITION

The May 20, 2024 findings and order after hearing is affirmed.  In the interests of justice, the parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

_____

Danner, J.

WE CONCUR:

_____

Greenwood, P. J.

_____

Bromberg, J.

**H052357**
*Herzog v. Kennard*